UNITED STATES of America,
Plaintiff-Appellee,

v.

James V. AQUAVELLA and Salmon C.
Harvey, Defendants-Appellants.

Nos. 1132, 1557, Docket 79–6017.

United States Court of Appeals,
Second Circuit.

Argued June 18, 1979.

Decided Dec. 6, 1979.

Modified On Rehearing March 17, 1980.

Robert C. Bernius, Rochester, N.Y. (Margaret J. Gillis, and Nixon, Hargrave, Devans & Doyle, Rochester, N.Y., on the brief), for appellant Aquavella.

David L. Fox, New York City (Lane Felcher Kurlander & Fox, New York City, on the brief), for appellant Harvey.

Richard P. Caro, Asst. U. S. Atty., Brooklyn, N.Y. (Edward R. Korman, U. S. Atty., and Harvey M. Stone, Asst. U. S. Atty., Brooklyn, N.Y., on the brief), for appellee.

Before WATERMAN, FEINBERG and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

On this appeal from a judgment entered in a civil action after a bench trial in the Eastern District of New York, Jacob Mishler, *Chief Judge*, granting judgment in favor of the United States in the amount of $251,567.00 plus interest, representing recovery of excess interim payments and advances paid to appellants under the Medicare Act[1] for their operation of an extended care facility, the following are the essential questions presented:

(1) Whether the district court erred in holding that it lacked subject matter jurisdiction to review the merits of the government's claims of overpayments and appellants' defense of offset;

(2) Whether the district court erred in holding that the procedures utilized in suspending the payment of interim funds to appellants and in assessing whether there had been overpayments complied with due process;

(3) Whether the district court erred in failing to dismiss the government's claims on the ground that they are compulsory counterclaims under Fed. R.Civ.P. 13 which should have been asserted in the original action brought by appellants. *Aquavella v. Finch*, 306 F.Supp. 860 (W.D.N.Y.1969), *rev'd sub nom. Aquavella v. Richardson*, 437 F.2d 397 (2 Cir. 1971).

For the reasons below, we hold that the district court erred in holding that it lacked subject matter jurisdiction. Accordingly, we reverse and remand for consideration of the merits of the government's claims of overpayment. Since the claims asserted by the government constitute compulsory counterclaims under Rule 13, we direct the district court to dismiss the present action and to consider the government's claims in the context of the still pending action in *Aquavella v. Richardson, supra.*

I.

This litigation has been pending in the district courts of this Circuit for more than a decade. This is the third trip to our Court. We think it is important to make clear where the parties have been, where they stand now and where they are to go in the future. Accordingly, we shall summarize the relevant facts and prior proceedings in that detail believed necessary to an understanding of our rulings on the legal issues raised and our directions to the district court on remand.

The instant action was commenced by the United States to recover certain alleged overpayments made under the Medicare Act to the Glen Oaks Nursing Home during the period from April 3, 1967 to August 7, 1969. Appellants Aquavella and Harvey are physicians. As partners they owned and operated Glen Oaks as a 60 bed "extended care facility" during the relevant period.[2] Glen Oaks as an extended care facility was designed to provide post hospitalization care less intensive than that provided by acute care hospitals, but more intensive than that provided by typical nursing homes. In particular, Glen Oaks specialized in rehabilitative medicine. Ap-

---

1. Health Insurance For The Aged Act, Pub. L. No. 89–97, tit. I, 79 Stat. 290 (1965). Hereafter, unless otherwise stated, all references to the Act will be to sections of its current codification at 42 U.S.C. §§ 1395–1395qq (1976).

2. An "extended care facility", referred to in the statute as a "skilled nursing facility", is "an institution . . . which has in effect a

transfer agreement . . . with one or more hospitals", § 1395x(j), and which provides nursing care, physical, occupational or speech therapy, drugs, supplies, appliances, and "such other services necessary to the health of the patients as are generally provided by skilled nursing facilities." §§ 1395x(h).

proximately $150,000 was invested in equipment for the physical and occupational therapy departments alone.

To qualify as a "provider" of extended care services under the Medicare Act, § 1395x(u), Glen Oaks entered into a contract in April 1967 with the Secretary of Health, Education and Welfare. The contract provided, among other things, that Glen Oaks as a provider would not charge Medicare patients for services rendered. Instead, Glen Oaks was entitled to receive reimbursement of the "reasonable cost"[3] of covered services either directly from the Secretary or through a "fiscal intermediary". The latter would be one of certain designated private organizations under contract to the Secretary. Under the Act, the Secretary generally is responsible for determining "reasonable cost". §§ 1395f(b), 1395x(v). *Aquavella v. Richardson, supra,* 437 F.2d at 399. The regulations then in effect, however, provided that when a fiscal intermediary was appointed, the responsibility for making the initial determination of reasonable cost, based on information submitted by the extended care facility, shifted to the fiscal intermediary. 20 C.F.R. §§ 405.405 and 405.454 (1970). Payments then are made by the fiscal intermediary to the provider at the estimated per diem rate upon an interim basis to provide the facility with a sufficient cash flow. § 1395g. At the end of the cost period, which usually is the end of the provider's fiscal year, a final review is conducted and any adjustments for overpayment or underpayment are made at that time.

In the instant case, Glen Oaks appointed Aetna Life & Casualty Co. in April 1968 to act as its fiscal intermediary.[4] Aetna served in this capacity, reimbursing Glen Oaks for routine and ancillary services rendered to Medicare beneficiaries, until July 11, 1969. At that time, the Secretary ordered Aetna to suspend interim payments to Glen Oaks. This order resulted from an on-site validation review of the medical and fiscal records of the facility which had been conducted by the Bureau of Health Insurance of the Social Security Administration in April 1969.[5] The auditor concluded that substantial sums of money had been advanced to Glen Oaks on claims which were not covered by Medicare.

On July 17, 1969, Aetna conducted its own on-site review. In addition, it conducted an audit of each of the cost reports submitted by Glen Oaks for its fiscal periods ending March 31, 1968, March 31, 1969 and August 7, 1969.

Referring to the audit by the Bureau of Health Insurance, aside from charges that Glen Oaks had billed for services not covered by the Act, the Secretary asserted that the facility had engaged in an over-utilization of occupational and physical therapy, and had increased the routine service charge without adequate cost justification. *Aquavella v. Richardson, supra,* 437 F.2d at 400.

Upon learning of the suspension of the interim payments, appellants commenced an action in the Western District of New York to enjoin the government from suspending payments and to obtain money damages. *Aquavella v. Finch,* 306 F.Supp. 860 (W.D.N.Y.1969). Since 59 out of 60 of the elderly patients receiving care at Glen Oaks were Medicare beneficiaries, appellants alleged that suspension of payments would force the facility to close. Indeed, in August 1969, Glen Oaks ceased operations for lack of funds. Chief Judge Henderson dismissed appellants' original and amended complaints for lack of jurisdiction, ruling that the action of the Secretary in ordering Aetna to terminate interim payments was not a final determination ripe for judicial review. *Id.* at 863–64.

---

3. § 1395x(v).

4. Originally, in April 1967, Glen Oaks appointed Hamilton Life Insurance Company as its fiscal intermediary. In April 1968, Hamilton's appointment was withdrawn and Aetna was appointed in Hamilton's place.

5. The Bureau of Health Insurance of the Social Security Administration has the responsibility of auditing cost reports of providers on a periodic basis.

While the action was pending in the district court, Dr. Aquavella entered into an agreement with Dr. Harvey pursuant to which the partnership was dissolved. Dr. Aquavella assigned his interest in Glen Oaks to Dr. Harvey. In return, Dr. Harvey agreed to indemnify Dr. Aquavella and to assume all liabilities except those that might arise out of Glen Oaks' participation in the Medicare program.

After the judgment of the district court dismissing the action was entered on October 1, 1969, notices of appeal were filed by both doctors. Only Dr. Aquavella, however, pursued his appeal. We reversed and remanded, holding that the district court erred in dismissing the claim for lack of jurisdiction. *Aquavella v. Richardson*, 437 F.2d 397 (2 Cir. 1971). We stated:

> "Where the Medicare Act establishes procedures for review of the Secretary's decision, a court may not review that decision by any other means. However, where the Act does not provide such procedures, section 405(h) does not preclude review . . . . Where, as here, the review procedures of the Medicare Act do not apply, they do not limit 'nonstatutory' review. We conclude, therefore, that it was error to dismiss the original complaint on the ground that the Medicare Act expressly or impliedly precluded the suit here." *Id.* at 402–03 (footnote omitted).

Although our mandate, including our opinion, was filed in the district court on February 23, 1971, the government did not file its answer or any counterclaims until May 1974 —more than three years later.

In the meantime, however, Dr. Harvey commenced an action on February 4, 1972 in the Eastern District of New York, seeking recovery of $301,019.00 in Medicare payments allegedly due and owing and $2,700,000 in tort damages. On April 6, 1976, Chief Judge Mishler dismissed this action with leave to replead in an action to be commenced in the United States Court of Claims. *Harvey v. Aetna Life & Casualty Co.*, No. 72 C 159 (E.D.N.Y. Apr. 6, 1976). Although an appeal was filed, Dr. Harvey stipulated to dismiss the appeal. The stipulation provided that upon dismissal of the appeal Dr. Harvey's action in the Court of Claims would be stayed pending final disposition of the instant action.

Dr. Aquavella, however, refused to enter into or to be bound by the stipulated dismissal. Accordingly, in May 1974, the government filed an answer, including counterclaims, in response to Dr. Aquavella's complaint which was pending in the Western District of New York pursuant to our remand in *Aquavella v. Richardson, supra*. In response to Dr. Aquavella's motion to strike the answer and counterclaims as untimely, the government filed a cross-motion to transfer the action to the Eastern District of New York. The district court granted the government's transfer motion and struck the government's answer and counterclaims without prejudice to their renewal in the Eastern District.

While these motions were pending in the Western District, the government, in June 1974, commenced its own action in the Eastern District seeking recovery of alleged overpayments made to Glen Oaks under the Medicare Act—the same relief sought by the government in its counterclaims in the original Western District action. The first claim alleged that Drs. Aquavella and Harvey fraudulently had overcharged the Medicare program and sought recovery of $155,467. The second claim sought recovery of $96,100 for loans made to appellants for "interim financing". Following the transfer of the Western District action to the Eastern District, Judge Mishler, on March 25, 1976, denied Dr. Aquavella's motion for a default judgment and granted the government's motion for leave to file an answer and counterclaim in the transferred action. He held that the government had "fully explained the default and shown good cause for leave to file an answer and counterclaim". *Aquavella v. Richardson*, 74 C 1092 (E.D.N.Y. Mar. 25, 1976).

In the government action in the Eastern District (which had been commenced in June 1974), trial began before Judge Mishler on December 13, 1976 and was concluded

on September 1, 1977, 21 court days having been devoted to the trial. At the beginning of the trial, the government announced that it had decided not to pursue its claims of fraud, but would proceed solely on its claims that appellants had overcharged the Medicare program $155,467 and had failed to repay the $96,100 they had received as loans for interim financing.

Also at the beginning of the trial, questions of subject matter jurisdiction and the scope of the court's power to review the government's claims were raised. Judge Mishler originally rejected the government's contention that the court had jurisdiction only to ratify and enforce the conclusions of overpayment reached by Aetna, stating:

> "I have reviewed the position of the Government on burden of proof and what the determination by HEW means, and I find the position absolutely untenable. This is not a case they review under the Administrative Procedure Act. I see nothing in the statute or regulation which gives [the Government] the right to rest on a determination and use this Court merely to enforce the determination by HEW. . . . I view this as either an action for money [had and] received or an action for breach of contract . . . . [The Government] will have to prove [its] case like any other litigant that comes in the Court . . . ."

Pressed by the government, the court thereafter certified this question of subject matter jurisdiction for interlocutory appeal to our Court pursuant to 28 U.S.C. § 1292(b) (1976), but we denied leave to appeal. *United States v. Aquavella*, No. 76–8546 (2 Cir. Jan. 27, 1977).

After the trial, Judge Mishler filed a comprehensive, well reasoned opinion. He concluded that judgment should be entered in favor of the government and against appellants in the amount of $251,567, plus interest. He ordered that execution on the judgment be stayed pending appeal.

On the issue of subject matter jurisdiction and the scope of the court's power to review the government's claims, Judge Mishler came out differently than he had indicated he would at the beginning of the trial. P. 17, *supra*. In his post-trial opinion he held that the Supreme Court's decision in *Weinberger v. Salfi*, 422 U.S. 749 (1975), interpreting 42 U.S.C. § 405(h) (1976), barred the court from considering the merits of the Secretary's determination that an overpayment had been made. The court nevertheless held that it had jurisdiction to review appellants' defense that they had been denied due process by the method used to determine the existence and amount of the alleged overpayment. After examining the procedure used—namely, an "exit conference" conducted by Aetna—the court held that appellants had not been denied due process and that the government was entitled to recover the amounts claimed.

From the judgment entered on Judge Mishler's opinion, appellants have taken this appeal.

## II.

In the light of these facts and prior proceedings, we turn first to the question whether the district court erred in determining that it lacked subject matter jurisdiction to review the merits of the government's claims of overpayment and appellants' defense of offset. We hold that the court did have subject matter jurisdiction and that 42 U.S.C. § 405(h) does not bar judicial review here.

The government commenced this action against the physicians pursuant to 28 U.S.C. § 1345 (1976) [6] which confers on the district courts original jurisdiction over all civil actions or proceedings brought by the United States. The district court held that a specific provision of the Social Security Act, 42

---

6. Originally, the government alleged three bases for jurisdiction: 31 U.S.C. § 232 (1976); 28 U.S.C. § 1345 (1976); and 28 U.S.C. § 1355 (1976). Since 31 U.S.C. § 232 and 28 U.S.C. § 1355 are applicable only to cases involving fraud or fines, penalties and forfeitures, these grounds for jurisdiction became inapplicable when the government decided to abandon its claims for fraud and double damages.

U.S.C. § 405(h), which has been incorporated in the Medicare Act, § 1395ii, barred consideration of the merits of the government's claims, barred the claims raised by appellants by way of offset, and limited the court to enforcing the government's right to collect the overpayments. While § 405(h) provides that no action shall be brought against the United States to recover on any claim or to review a determination of the Secretary except as provided in the statute, the section does not expressly preclude the review sought in the instant case.[7] In holding that review was precluded, the district court relied on several decisions interpreting § 405(h) in the context of actions brought against the government to recover money claimed to be owing to private plaintiffs.

Specifically, the court relied on the Supreme Court's decision in *Weinberger v. Salfi*, 422 U.S. 749 (1975). That case involved a class action brought by beneficiaries under the Social Security Act to challenge the constitutionality of the requirement of the Act that a step-child or widow of a deceased wage earner must show that his or her relationship with the wage earner had existed for at least nine months prior to the death of the wage earner in order to receive insurance benefits. Since a constitutional claim was raised, jurisdiction in the district court was predicated on general federal question jurisdiction. 28 U.S.C. § 1331 (1976). The Supreme Court held that, despite the presence of a constitutional claim, § 405(h) barred the class action, even though each aggrieved individual could challenge the validity of the requirement of the Act in an action brought pursuant to the procedure set forth in § 405(g). The Court focused on one of the major concerns of Congress in enacting § 405(h), namely, to prevent claimants from bypassing the procedural requirements of § 405(g).

Subsequently, in *South Windsor Convalescent Home, Inc. v. Mathews*, 541 F.2d 910 (2 Cir. 1976), we held that the *Salfi* interpretation of § 405(h) precluded the district courts from reviewing a challenge to the Secretary's determination with regard to provider reimbursements in an action brought by a "provider" of services under the Medicare Act. Although § 405(g) had not been incorporated in the Medicare Act[8] and therefore was unavailable to the plaintiff in *South Windsor*, we concluded that plaintiff's recourse was to commence an action in the United States Court of Claims which has exclusive jurisdiction over the provider's claims for money from the government. We recognized, however, that *Salfi* could pose problems:

> "[W]hen *Salfi's* conclusion is applied to a case where no alternative jurisdictional basis exists, its restrictive interpretation of § 1331 might lead to a constitutional question of the first order, one that has arisen but rarely and tangentially in our constitutional history, i. e., whether the Congress can close the federal courts entirely to constitutional challenges directed against federal statutes or action." *Id.* at 913 (footnotes omitted).

Indeed, the decision of the district court in the instant case, if allowed to stand, would create the very conflict which we anticipated in *South Windsor.* Unlike *South Windsor*, the Court of Claims has no jurisdiction in the instant case where the action was brought by the government to recover overpayments from the provider. Moreover, to the extent that review might be available under the Administrative Procedure Act, as we suggested in *South Windsor, id.* at 913 n.3, the Supreme Court's decision in *Califano v. Sanders*, 430 U.S. 99, 104–07 (1977), subsequently precluded that possibility.[9] Since the only case decided

---

**7.** P. 19, *infra*, and accompanying notes 10–11, *infra*.

**8.** 42 U.S.C. § 405(g) authorizes a civil action to be commenced in a district court within 60 days of the mailing of HEW's notice of decision. As stated in the text, however, § 405(g), unlike § 405(h), had not been incorporated in the Medicare Act. 42 U.S.C. § 1395ff(c) (1976); *South Windsor Convalescent Home, Inc. v. Mathews, supra*, 541 F.2d at 912.

**9.** In *Califano v. Sanders*, the Supreme Court held that the Administrative Procedure Act was not an implied grant of subject matter jurisdiction permitting district courts to review agency

after *Salfi* to hold that the district court had jurisdiction despite § 405(h) involved a due process challenge to the Secretary's determination, *St. Louis University v. Blue Cross Hospital Service*, 537 F.2d 283 (8 Cir.), *cert. denied*, 429 U.S. 977 (1976), the district court in the instant case concluded that it had jurisdiction only to entertain appellants' claims that they had been denied due process by the procedure used in determining the overpayments.

Appellants argue that the district court erred in applying the holdings of *Salfi* and *South Windsor* to the instant case. We agree. Appellants' defense to the instant government action in essence is that under their contract with the Secretary they were entitled to payment for services rendered. There is no dispute that services were rendered. The questions are whether those services were covered by § 1395(d) and whether the amount claimed represents the "reasonable cost" of such services. In *Salfi*, on the other hand, the beneficiaries had a "non-contractual claim to receive funds from the public treasury"—a claim that the Supreme Court held "enjoys no constitutionally protected status". 422 U.S. at 772. Similarly, our holding in *South Windsor* that § 405(h) precluded review of an action brought by the provider "against the United States" is not applicable to the instant case which is a contract action brought *by the United States* against the providers. At most, the decisions relied upon by the district court held that a provider is prevented from bringing an action in a district court for money claims when an alternative forum exists for review. Whether review is precluded when the government brings its own action to recoup payments appears to be a question of first impression in this Court.

Our analysis of § 405(h) leads us to the conclusion that preclusion was not intended in a case such as the instant one. It is clear that no portion of § 405(h) specifically divests the district courts of jurisdiction in actions such as this one. It merely provides:

"The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. *No action against the United States,* the Secretary, or any officer or employee thereof *shall be brought* under sections 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter." 42 U.S.C. § 405(h) (1976) (emphasis added).

The first sentence provides that the Secretary's decisions after a hearing shall be binding. This is not relevant to the present situation since there has been no hearing and no findings have been made by the Secretary, at least insofar as contemplated by this section.[10] Similarly, the second sentence is irrelevant since, at the time this action was commenced, no alternative method of review was provided by statute in disputes involving providers of services under the Medicare Act.[11] Finally, the third sentence relates to actions brought "against the United States" and certain federal officials, not to actions brought by the United States. Indeed, the entire thrust of the section is to prevent claimants who seek judicial review of their claims for benefits from bypassing the specific procedural requirements provided by Congress in the various acts. *Weinberger v. Salfi, supra,* 422 U.S. at 757–59, 763–64.

determinations. 430 U.S. at 104–07. Accordingly, our suggestion in *South Windsor* that the preclusion of § 405(h) can be avoided by grounding review on § 10 of the APA is no longer viable.

**10.** See text at pages 21–22, *infra*.

**11.** Until 1972, there was no provision in the Act for resolving disputes between providers and

the government. In 1972, however, Congress responded to the problem posed in *Aquavella v. Richardson, supra*, and *Coral Gables Convalescent Home, Inc. v. Richardson*, 340 F.Supp. 646 (S.D.Fla.1972), by establishing a separate integrated system for the resolution of payment disputes with both administrative and judicial review. 42 U.S.C. § 1395oo (1972).

The Medicare Act, however, until recently failed to provide alternative methods for the resolution of disputes between providers and the government.[12] The statute did make available two alternative courses of action to the government when it suspected overpayments. For example, the Act authorized the government to terminate Glen Oaks as a "provider", in which case administrative hearings and judicial review were available under § 1395ff. As an alternative course of action, the government was authorized to withhold from future financing sufficient funds to recoup the overpayments; this procedure was authorized by § 1395g and was used in *Mount Sinai Hospital of Greater Miami, Inc. v. Weinberger,* 517 F.2d 329 (5 Cir. 1975), *cert. denied,* 425 U.S. 935 (1976). *See also Wilson Clinic & Hospital, Inc. v. Blue Cross of South Carolina,* 494 F.2d 50 (4 Cir. 1974). Under this procedure judicial review was available in the Court of Claims. *South Windsor, supra,* 541 F.2d at 914.

Instead of resorting to either of these methods, the government in the instant case chose simply to suspend payments. This had the effect of terminating Glen Oaks as a provider without the formal hearings provided for in § 1395ff. The government now asserts a common law right to recoup money that it claims was wrongfully paid to appellants. *Mount Sinai Hospital of Greater Miami, Inc., supra,* 517 F.2d at 337. While the method resorted to by the government in this case is neither authorized nor prohibited by statute, the government's argument that its claims resulting from overpayments are insulated from judicial review must be rejected. As in any other contract action the government should not prevail unless the district court determines that the money the government seeks to recoup indeed resulted from overpayments by it.

■ The Supreme Court has held that congressional intent to preclude jurisdiction will not be assumed unless there is clear and convincing evidence thereof. *Johnson v. Robison,* 415 U.S. 361, 373 (1974); *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141 (1967). Congress clearly provided for judicial review in cases where the provider is terminated altogether. § 1395ff. Nothing in the Act indicates that Congress intended to deprive a provider of his right to sue in the Court of Claims. In 1972, moreover, Congress amended the Medicare Act to provide a procedure, with both administrative and judicial review, by which providers could obtain resolution of their disputes. § 1395oo. Contrary to Judge Mishler's conclusion, we hold that this amendment does not imply that § 405(h) was intended to preclude judicial review. It simply indicates that Congress opted for an additional procedure which would become exclusive by operation of § 405(h). *Kingsbrook Jewish Medical Center v. Richardson,* 486 F.2d 663, 668 (2 Cir. 1973).

■ We conclude that § 405(h) was not intended to preclude the district court from considering the merits of the government's claims of overpayment or appellants' defense by way of offset.[13] Aside from the

---

12. Note 11, *supra.*

13. We note the government's argument that, while the district court had jurisdiction to entertain the merits of the government's claims, the "defendants may only challenge the overpayment determination as being arbitrary or capricious" under the standards set forth in *Citizens To Preserve Overton Park v. Volpe,* 401 U.S. 402 (1971), and that "they may not dispute the factual merits of the overpayment determination *per se."* The government's argument is that the interim payments to the facility were made on the condition that, if after final review a disallowance were administratively determined, then the amount found to be overpaid would be repaid directly or offset against future payments. In other words, the government views its action as one to enforce a condition of the contract. It contends that if an overpayment were determined, and if that determination were not arbitrary or capricious, were not determined contrary to proper legal standards or without constitutionally sufficient procedures, and were not "clearly erroneous", then the government would be entitled to judgment. Indeed, the government contends that the district court below made such a determination.

We think it is clear from the district court's opinion that such a determination was *not* made. Even if it had been, we reject the government's proposed limitations on the

fact that § 405(h) by its terms applies only to actions brought against the government and not by the government, it is important to recognize that to hold otherwise would totally deprive appellants of any judicial review. No alternative remedy is available. To hold that the district court has no jurisdiction to consider the merits of the government's claims would result in a deprivation of due process as we pointed out in *South Windsor, supra,* 541 F.2d at 913–14.

Accordingly, on the first question presented, we hold that the district court does have subject matter jurisdiction. We therefore reverse and remand to the district court with instructions to determine on the merits the government's claims of overpayment and appellants' defense of offset.

### III.

We turn next to the second question presented, namely, whether the district court erred in holding that the procedures utilized in suspending the payment of interim funds to appellants and in assessing whether there had been overpayments complied with due process. On this question, we remand for further findings.

The Medicare Act authorizes the Secretary to delegate to a fiscal intermediary the task of determining the amount of payments to be made to the provider. § 1395h(a). Nevertheless, it remained the Secretary's responsibility to "safeguard the interest of his contractual representatives with respect to their actions in the fulfillment of commitments under the agreements entered into by them with the Secretary". 20 C.F.R. § 405.651(c) (1970). In the instant case, Aetna as the fiscal intermediary initially determined that overpayments

had been made to Glen Oaks. At the direction of the Secretary, Aetna suspended interim payments to the facility. This was done without affording appellants a hearing. The Social Security Administration reviewed Aetna's determination at a formal "exit conference" on July 29, 1971. Representatives of Aetna, Glen Oaks, and the Social Security Administration were present.

Although the district court opinion does not describe the procedure followed at the exit conference in any detail, the court concluded that the exit conference complied with due process, relying chiefly on *Mathews v. Eldridge,* 424 U.S. 319 (1976). The district court found that appellants had ample notice of the government's claim, that they had an opportunity to answer the claim, that they were afforded an opportunity to present data relating to costs and to supply any missing documentation, and that the determination of costs and coverage was based "almost entirely on records furnished by the provider".

■ Appellants dispute these findings. Dr. Aquavella says that he was not even a party to the conference. Both appellants say that they were not permitted to present any data relating to the types of services covered by the Act. Indeed, a government witness acknowledged in testimony before the district court that if any information had been given by appellants it would have been ignored. Absent a record of the conference proceedings, it is virtually impossible for us to evaluate the district court's conclusion that the exit conference complied with due process. As Dr. Aquavella points out, the "issue of precisely how the exit conference was conducted is a key

court's jurisdiction to review the merits of the overpayment determination. *Overton Park* involved an action by private citizens who sought judicial review of a determination by the Secretary of Transportation pursuant to § 702 of the Administrative Procedure Act, 5 U.S.C. § 702 (1976), which provides in relevant part:

"A person suffering legal wrong because of agency action . . . is entitled to judicial review thereof."

The standards for judicial review explored by the Court in *Overton Park* and urged by the

government in the instant case are those set forth in § 706 of the APA. 5 U.S.C. § 706 (1976). Aside from the fact that review in the instant case is not based on the APA, we reject the government's argument because its claim rests solely on common law contract rights, not on any statutory grant of agency authority. Accordingly, we hold that the standards of § 706 are inapplicable to this case.

question which remains to be fully tried." Accordingly, we remand to the district court for more detailed findings with regard to the procedure followed at the exit conference.

■ Aside from the sparse record, appellants also contend that the determination of overpayments was made essentially by Aetna, which not only had a financial interest in the outcome but which was called upon to interpret and apply Medicare regulations—a function which should have been performed by the agency alone. In its opinion the district court stated: "The trial revealed that the procedures were fair and that the statutes, regulations and guides . . . were fairly applied to the facts in this case." It is not clear to us, however, whether the district court actually considered the claim that Aetna had a financial stake in the outcome. As the Supreme Court observed in *Withrow v. Larkin*, 421 U.S. 35, 47 (1975), among those cases in which "actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable" is the situation "in which the adjudicator has a pecuniary interest in the outcome". Since Aetna would have been charged by the Social Security Administration for any payments made for services not covered by the Act, its obvious financial stake in the determination of overpayments was a factor which the district court should have considered in assessing due process.

Accordingly, since a remand is necessary to enable the district court to evaluate the merits of the government's claim and appellants' defenses, the district court should also consider and make findings on the matter of Aetna's interest in the determination and should consider and make findings on claims with regard to the sufficiency of the hearing they received.

## IV.

Turning to the third question presented, appellant Aquavella contends that the government's complaint in the instant case should have been dismissed because the claims raised are compulsory counterclaims which should have been asserted in the original action brought by Aquavella and Harvey. *Aquavella v. Richardson, supra.* We agree. Accordingly, in reversing and remanding, we direct the district court to determine the merits of the government's claims of overpayment in the context of *Aquavella v. Richardson, supra.*

■ Fed.R.Civ.P. 13(a) in relevant part provides:

"A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction."

In determining whether a claim "arises out of the transaction . . . that is the subject matter of the opposing party's claim", this Circuit generally has taken a broad view, not requiring "an absolute identity of factual backgrounds . . . but only a logical relationship between them." *United Artists Corp. v. Masterpiece Productions, Inc.*, 221 F.2d 213, 216 (2 Cir. 1955). This approach looks to the logical relationship between the claim and the counterclaim, see, e. g. *Koufakis v. Carvel*, 425 F.2d 892, 899 (2 Cir. 1970), and attempts to determine whether the "essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Harris v. Steinem*, 571 F.2d 119, 123 (2 Cir. 1978).

■ Applying this standard, we hold that the government's claims for overpayments are compulsory counterclaims within the meaning of Rule 13(a) and that they should have been adjudicated along with appellants' claims for an injunction and money damages in the original action. *Aquavella v. Richardson, supra.* Not only are the government's claims logically related to appellants' claims, but they are based on the identical transaction which is the subject of

appellants' claims in *Aquavella v. Richardson,* namely, Aetna's determination that Glen Oaks had been paid for services not covered by the Medicare Act. Indeed, the government sought leave to assert these very claims as counterclaims in *Aquavella v. Richardson* and was granted leave to assert them in that action in March of 1976.

The government argues that, regardless of whether these were compulsory counterclaims or not, the assignment by Dr. Aquavella of his interest in Glen Oaks to Dr. Harvey in 1969, coupled with Dr. Harvey's failure to pursue his appeal, deprived this Court of jurisdiction to hear Dr. Aquavella's appeal in *Aquavella v. Richardson,* 437 F.2d 397 (2 Cir. 1971). Consequently, so the government's argument goes, the district court's dismissal of the action in October 1969 should be considered the final judgment in the Western District action, rendering it futile to raise these counterclaims in the context of that action. The government, however, failed to make this argument either before our Court at the time of the *Aquavella* appeal or before the district court at the time of the transfer of the action from the Western District to the Eastern District. It does not appear that the assignment of Dr. Aquavella's interest included an assignment of his interest in the *Aquavella v. Richardson* litigation.

We express no opinion as to whether the *Aquavella v. Richardson* litigation should be tried in the Eastern District of New York or in the Court of Claims. We leave that question for the district court to determine in the first instance with the aid of counsel for the parties. We note, however, that despite the fact that Dr. Harvey did not pursue his appeal in *Aquavella v. Richardson* and stipulated to dismiss the appeal

from the dismissal of his Eastern District action, p. 16, *supra,* Rule 13(h) permits additional parties to be brought in if their presence is required for the granting of complete relief.

Accordingly, we reverse and remand with directions to the district court to dismiss the instant action, but to consider on the merits the government's claims as counterclaims raised in the still pending original action of *Aquavella v. Richardson.*[14]

Reversed and remanded with instructions.

---

**14.** Appellants raise other claims, all of which we leave to the district court to determine in the first instance.

For example, appellants contend that good faith is an absolute defense to the government's action for overpayments and that the district court found that appellants had acted in good faith in charging Medicare for the services which later were determined by Aetna not to be covered by the Act. In view of the district court opinion, on remand the district court

should clarify whether it did in fact make a determination of good faith in the context of appellants' claim of good faith as an absolute defense. The government in its brief attempts to show that the overpayment determination was correct and presents a detailed account of services covered and charges made. This clearly is an issue which should not be determined by this Court in the first instance on appeal.